UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| LOUIS L. LIGON III,<br><br>        Plaintiff,<br><br>    v.<br><br>META PLATFORMS INC.,<br><br>        Defendant. | Case No.  25-cv-03959-RMI<br><br>**ORDER ON MOTION TO DISMISS**<br>Re: Dkt. Nos. 50, 60 |

Plaintiff Louis Ligon III brings this case against Defendant Meta Platforms, Inc., alleging that Defendant violated his civil rights and right to free speech by its actions during the 2024 election for Georgia State Senate. (Compl., Dkt. 1; First Amended Compl., Dkt. 49.) Now pending before the court is Defendant's Motion to Dismiss and request for judicial notice, (dkts. 50 & 51), re-noticed after this case was reassigned to this court following the consent of the parties, (dkt. 60). Plaintiff has filed his response, (dkt. 52), Defendant has replied, (dkt. 54), and the motion is ripe for adjudication on the merits. For the following reasons, the court GRANTS Defendant's Motion to Dismiss.

BACKGROUND

*1. Procedural History*

Plaintiff, proceeding pro se, originally filed this complaint in the United States District Court for the Northern District of Georgia on August 9, 2024. (Compl. 1.) The Georgia District Court transferred the case to this district based on the mandatory forum-selection clause in Defendant's Terms of Service, and this district received the case on May 7, 2025. (Order, Dkt. 24; Transfer Receipt, Dkt. 28.) The presiding judge at the time then granted Plaintiff leave to amend,

United States District Court
Northern District of California

and Plaintiff filed his First Amended Complaint ("FAC") on September 4, 2025. (Order, Dkt. 48; FAC, Dkt. 49.) Defendant filed its Motion to Dismiss on September 20, 2025, after which Plaintiff filed his response and Defendant filed its reply.[1] (Dkts. 50, 52, & 54.) The case was then reassigned to this court on November 17, 2025. (Order Reassigning Case, Dkt. 59.) Defendant filed an amended Notice of Motion to Dismiss, identifying this court as the adjudicating court, (dkt. 60), to which Plaintiff filed a response and request for oral argument, (dkt. 62). Defendant filed a response to argue that Plaintiff's second response was improper and should not be considered.[2] (Dkt. 63.) The court then found that the Motion to Dismiss was appropriate for adjudication on the papers and vacated the hearing. (Dkt. 64.)

*2. Facts Alleged in the FAC*

Plaintiff registered with the Republican Party of Georgia and the Georgia Secretary of State's Office on March 7, 2024, to run as a Republican candidate for Georgia State Senator in District Seven. (FAC ¶ 7.) Defendant Meta Platforms, Inc. owns and operates the social media websites Facebook and Instagram. (FAC ¶ 4.) On May 6, 2024, Plaintiff signed a "Verification of Identity" form with Defendant to meet the advertising policy requirements for running political campaign ads on Defendant's platform Facebook. (FAC ¶ 8.) Plaintiff received a verification code on May 8 for additional vetting. (FAC ¶ 9.) On May 9, he created six political ads for his

---

[1] Defendant argues in its reply that Plaintiff's response should be given little weight because he improperly used artificial intelligence ("AI") to draft his filing, leading to many misstatements of law. (Def.'s Reply 2, Dkt. 54.) The court agrees that the vast majority of Plaintiff's case citations are cited for legal propositions that the cases themselves do not support, and this impacts how the court weighs his arguments—however, the court declines to independently factor in Plaintiff's use of AI software when weighing his response, as it does not contain any hallucinated or fabricated citations and there is no need to separately account for his use of AI in considering his arguments. Plaintiff is cautioned, however, that it is his responsibility to ensure that any filings drafted with AI assistance are properly reviewed for accuracy before they are submitted to this court. Additionally, the court notes that Plaintiff's response contains a number of factual citations and allegations not included in his FAC, which are improper and will not be considered as part of the analysis of the Motion to Dismiss.

[2] In response to the re-noticed Motion, Plaintiff filed another substantive brief arguing his position and containing facts not alleged in the FAC. (Dkts. 61 & 62.) Defendant argued that this response was improper and that Plaintiff should not be given a second chance to make the arguments he should have made in his original response. (Dkt. 63.) The court agrees that Plaintiff cannot file two responses to the same Motion—as such, Plaintiff's response to the re-noticed Motion at Dkts. 61 and 62 will not be addressed in this Order, particularly to the extent that the response contains different arguments from his original response or facts not alleged in the FAC.

United States District Court
Northern District of California

campaign for Georgia State Senate, which were planned to run for the next ten days through the early voting period leading up to the main statewide election on May 21, 2024, and were intended to be shown on Facebook to the approximately 150,000 residents of Georgia District Seven. (FAC ¶ 10.) Plaintiff paid Defendant $653.00 for the six advertisements and "verified, approved, populated, and scheduled the campaign ads to run starting May 10, 2024." (FAC ¶ 10.)

The ads ran for a partial day on May 10, but the following day, Plaintiff received five emails from representatives of Defendant informing him that his ads were flagged because of "unspecified violations" of community standards.[3] (FAC ¶ 11.) He was also told that his campaign ads and campaign Facebook page might be permanently suspended as a result. (FAC ¶ 11.) Plaintiff replied to the emails within 24 hours and requested information on the specific violations so that he could correct the problems quickly. (FAC ¶ 12.) He attempted to appeal through the links provided in the emails, but the links were nonfunctional. (FAC ¶ 33.) He received no response from Defendant, and his campaign ads, campaign pages, and personal profiles on Facebook and Instagram were permanently suspended the next day without any further explanation. (FAC ¶ 12–13.) The ads and campaign messaging continued to run without issue on other social media sites, including X and Truth Social. (FAC ¶ 14.) Plaintiff attempted to recreate his campaign pages on Facebook and Instagram after they were suspended, but these duplicate pages were also suspended with no explanation in May 2024. (FAC ¶ 19.) On May 21, 2024, Plaintiff filed an official election interference complaint against Defendant with the Georgia Secretary of State and the Georgia State Election Board. (FAC ¶ 16.)

Plaintiff alleges that Defendant's permanent suspension of his personal Facebook profile

---

[3] Plaintiff attached some of the emails from Defendant to his original complaint: an email from May 10 begins by stating "Your Facebook page is scheduled for permanent deletion due to a post that has infringed upon our trademark rights," (Compl. Ex. D-1, Dkt. 1, at 19); a different email from the same day begins with the same sentence, (Compl. Ex. D-2, Dkt. 1, at 21); another email from May 10 begins, "Dear administrator, we have received multiple reports that your business account has violated the terms of service and community guidelines. 1. Using false names/images of others. 2. Sharing content that puts other users at risk. 3. Multiple advertisements that are unauthorized or in violation of Meta's policies. 4. Using tricks to bypass Meta's ad verification system" and informs Plaintiff that his account is scheduled for review, (Compl. Ex. D-3, Dkt. 1, at 23); and the final email from May 10 from the Meta Support-Team says, "Your page was detected with copyright infringement" and informs Plaintiff that his account is scheduled for review, (Compl. Ex. D-4, Dkt. 1, at 25).

caused him to lose hundreds of photos, communications with constituents, and administrative roles in three community groups, "causing significant personal and professional harm." (FAC ¶¶ 12, 15.) In addition, Defendant allegedly "engage[d] in a pattern of post-suspension harassment," including through sending him two identical emails on May 4, 2025, alleging new violations associated with the suspended accounts and ads and providing a non-functional link to appeal; sending him another email on May 20, 2025, alleging copyright violations associated with one of the suspended ads; and sending an email "on behalf of" Universal Music Group to Plaintiff on May 20, 2025, alleging that he had unlawfully used 45 seconds of a copyrighted song on his suspended campaign page and demanding the removal of the infringing content. (FAC ¶ 13.)

Plaintiff alleges that Defendant's suspension of his profile page and campaign ads was part of Defendant's partnership with "government-aligned entities, such as the Elections Infrastructure Information Sharing and Analysis Center ("EI-ISAC")," and with other fact-checking organizations like Politifact, which allegedly "disproportionately flag conservative content." (FAC ¶ 17.) Plaintiff also alleges that he was one of multiple conservative political candidates who faced the same unexplained suspensions. (FAC ¶ 21.) Because of his reliance on Defendant for effective advertising and outreach, Plaintiff argues that Defendant disrupted his campaign during a critical voting period, breaching its contractual obligations and violating both Plaintiff's rights and the rights of District Seven voters. (FAC ¶¶ 16, 18, 22–26.) Finally, he alleges that Defendant makes content moderation decisions based on "opaque algorithmic processes" and a "nonfunctional appeal system," (FAC ¶ 20), and that this lack of transparency or meaningful review "transforms these suspensions into a prohibited prior restraint on speech" and "necessitates comprehensive discovery to uncover the extent of Defendant's unconstitutional practices." (FAC ¶¶ 24, 20).

*3. Causes of Action in the FAC*

Plaintiff brings eight causes of action against Defendant in the FAC. The first claim is for violation of Plaintiff's First Amendment rights to free speech and political expression, alleging that social media platforms are modern public squares subject to the First Amendment; that Defendant targeted Plaintiff's advertisements for their conservative viewpoints; that Defendant's "extensive partnerships with EI-ISAC and government-influenced fact-checkers" render it a state

4

actor; that Section 230 immunity does not apply because the claim is based on Defendant's own content moderation decisions; and that Defendant's suppression of Plaintiff's advertisements was a "targeted effort to silence conservative political speech." (FAC ¶¶ 27–31.) The second cause of action is for violation of Plaintiff's Fifth Amendment procedural due process rights based on "Defendant's failure to provide adequate notice or a functional appeal process for the suspensions of Plaintiff's advertisements and accounts." (FAC ¶¶ 32–34.) The third claim is brought under 42 U.S.C. § 1985(3) for conspiracy to deprive Plaintiff of his civil rights—he alleges that Defendant conspired with fact-checkers and "government-aligned entities" to deprive him of equal protection because of his conservative views. (FAC ¶¶ 35–36.) Because Defendant's conduct impacted his campaign, he also mentions interference with voting rights as part of this claim. (FAC ¶ 36.) He then repeats his argument that Section 230 immunity does not apply because the claim is based on Defendant's own actions rather than third-party content. (FAC ¶ 37.) The fourth cause of action is brought pursuant to 42 U.S.C. § 1986 and alleges that Defendant is liable under this section because it had knowledge of the conspiracy to deprive Plaintiff of his rights and failed to prevent it (and that Section 230 immunity does not apply for the same reasons as above). (FAC ¶¶ 38–40.)

Plaintiff's fifth cause of action is for breach of contract. (FAC ¶ 42.) Plaintiff claims that Defendant entered into a binding implied contract with Plaintiff by accepting his payment of $653.00 and approving his advertisements to appear for District Seven voters, that it impliedly promised fair and transparent enforcement, and that Defendant breached this contract when it refused to run his ads and suspended his account without explanation or opportunity to appeal. (FAC ¶¶ 41–43.) Claim six alleges that Defendant violated the implied covenant of good faith and fair dealing when it suspended Plaintiff's accounts and advertisements in bad faith based on his conservative political viewpoints. (FAC ¶¶ 44–46.) The seventh cause of action is brought pursuant to 42 U.S.C. § 1981, claiming that Defendant's suspension of Plaintiff's ads and accounts "discriminated against Plaintiff in the making and enforcement of contracts . . . based on his conservative political viewpoint, a protected characteristic under § 1981's broad interpretation." (FAC ¶¶ 47–48.) Finally, the eighth claim is brought for harassment and intentional infliction of emotional distress. (FAC ¶¶ 49–52.) This claim is based on Defendant's "ongoing pattern of

5

sending threatening and harassing emails after the permanent suspension of Plaintiff's accounts," despite knowing that Plaintiff had no access to the accounts and no way to appeal or address the alleged violations. (FAC ¶ 50.) According to the FAC, this conduct caused Plaintiff "severe emotional distress, including anxiety, mental anguish, and loss of quality family time," which was worsened by "the loss of irreplaceable personal content and the public reputational harm from false allegations of policy and copyright violations." (FAC ¶ 51.) This claim also requests punitive damages because Defendant's actions were "intentional and malicious" retaliation for Plaintiff's political speech. (FAC ¶ 52.)

Plaintiff requests multiple kinds of relief in his FAC. First, he requests a declaratory judgement that Defendant committed the violations alleged in all eight causes of action and is not protected by Section 230. (FAC at 24–25.) Second, he requests injunctive relief ordering Defendant to reinstate his campaign Facebook page, reinstate his personal Facebook page, reinstate his political advertisements, reinstate his personal Instagram page, immediately cease further suspensions or other actions against his accounts, immediately cease sending harassing emails based on alleged content violations, and "permit comprehensive discovery of internal algorithms." (FAC at 25–26.) Third, Plaintiff requests monetary damages: $2,500,000.00 in compensatory damages for the disruption of Plaintiff's campaign, emotional distress, reputational harm, the cost of recreating his online presence, and the loss of his administrative roles in community groups; and $10,000,000.00 in punitive damages for willful and malicious suppression of Plaintiff's speech. (FAC at 26–27.) Finally, Plaintiff requests attorney's fees and costs and "[s]uch further relief as the Court deems just, including discovery into Defendant's algorithms to ensure transparency and prevent future harm." (FAC at 27.)

**LEGAL STANDARD**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim for which relief may be granted. Rule 12(b)(6) requires dismissal when a complaint lacks either a "cognizable legal theory" or "sufficient facts alleged" in support of such a theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation omitted). A complaint contains sufficient factual allegations if it pleads enough facts to

6

"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In turn, a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Plausibility is a context-specific task that requires the reviewing court to determine if the well-pleaded facts permit the court to infer more than the mere *possibility* of misconduct. *Id.*

When evaluating a motion to dismiss, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).

Pro se pleadings are to be liberally construed, but they still must meet basic plausibility standards and provide the minimum factual basis necessary to give defendants notice of the claims against them. *See Turner v. Cnty. of Los Angeles*, 18 F. App'x 592, 596 (9th Cir. 2001) ("Even given the more generous pleading standards for pro se plaintiffs, [plaintiff] has failed to provide a minimum factual basis needed to provide notice to these defendants."); *Ortez v. Washington Cnty.*, 88 F.3d 804, 807 (9th Cir. 1996) (pro se pleadings must be construed liberally on Rule 12(b)(6) motions, such that the court should determine whether the plaintiff would not be entitled to relief "under any state of facts he could prove"). When dismissing a claim, a court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

**DISCUSSION**

**A. Request for Judicial Notice**

Defendant requests that the court take judicial notice of three documents for the purposes of ruling on its Motion: a true and correct copy of the Meta Terms of Service in effect at the time of the alleged events; a true and correct copy of the Instagram Terms of Use in effect at the time of

the alleged events; and a true and correct copy of Meta's Advertising Standards in effect at the time of the alleged events. (Def.'s Request Judicial Notice, Dkt. 51; Duffy Decl. ¶¶ 5–7, Dkt. 50-1.) In general, courts cannot look beyond the four corners of the complaint and the attached exhibits when ruling on Rule 12(b)(6) motions to dismiss. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). However, courts may take judicial notice of outside information and may consider documents incorporated by reference. Courts may judicially notice facts not subject to reasonable dispute that are (1) generally known in the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by sources whose accuracy cannot be reasonably questioned. Fed. R. Evid. 201(b). Separately, courts may incorporate by reference documents that are not attached to the complaint but are central to the plaintiff's claim and are unquestionably authentic. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (finding that the incorporation by reference doctrine applies when "plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint").

Defendant represents that all users of Facebook and Instagram must agree to the terms as a condition of using those services; it further represents that all users who advertise across its services are covered by the Advertising Standards, which are incorporated into the terms. (Duffy Decl. ¶¶ 3–4, 7.) Defendant has also represented that the documents attached to its motion are the terms of service/use and advertising standards in place during the events alleged in the complaint. (Duffy Decl. ¶¶ 5–7.) Plaintiff did not oppose the request for judicial notice or object to the authenticity of the documents.

Defendant Meta Platform's Terms of Service and Instagram Terms of Use are publicly available webpages that are routinely judicially noticed in this district. *E.g.*, *Scott v. Meta Platforms, Inc.*, No. 25-CV-09955-TSH, 2026 WL 593341, at *6 (N.D. Cal. Mar. 3, 2026) (taking judicial notice of Meta's Terms of Service); *Lloyd v. Facebook, Inc.*, No. 21-CV-10075-EMC, 2022 WL 4913347, at *4 (N.D. Cal. Oct. 3, 2022) (incorporating by reference Meta's Terms of Service and Data Use Policy); *Moates v. Facebook, Inc.*, No. 22-CV-04478-RFL, 2024 WL

United States District Court
Northern District of California

2853976, at *1 n.1 (N.D. Cal. Apr. 3, 2024) (incorporating by reference Meta's Terms of Service). *Cf. Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 869 (N.D. Cal. 2022) (judicially noticing Twitter's Terms of Service); *Zhang v. Twitter, Inc.*, No. 23-CV-00980-JSC, 2023 WL 5493823, at *3 (N.D. Cal. Aug. 23, 2023) (same); *Huber v. Biden*, No. 21-CV-06580-EMC, 2022 WL 827248, at *1 n.1 (N.D. Cal. Mar. 18, 2022) (same); *Coffee v. Google, LLC*, No. 20-CV-03901-BLF, 2021 WL 493387, at *4 (N.D. Cal. Feb. 10, 2021) (taking judicial notice of Google's Terms of Service); *Matera v. Google, Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *5 (N.D. Cal. Aug. 12, 2016) (same). The Advertising Standards are incorporated into the terms and are similarly available to the public. Plaintiff does not dispute that the proffered Meta Terms of Service, Instagram Terms of Use, and Advertising Standards are authentic, and thus the court GRANTS the request and takes judicial notice of Meta's Terms of Service, Instagram's Terms of Use, and Meta's Advertising Standards.[4]

**B. Section 230 Limits on Liability**

Defendant first moves to dismiss the FAC on the grounds that every claim in the complaint is barred by Section 230(c)(1) of the Communications Decency Act, 47 U.S.C. § 230(c)(1). Section 230, titled "Protection for private blocking and screening of offensive material," contains the following provisions: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider . . . . No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(c)(1), (e)(3). Thus, Section 230(c)(1) immunity applies to "(1) a provider or user of an interactive computer service, (2) whom a plaintiff seeks to treat, under a [federal or] state law cause of action, as a publisher or speaker, (3) of information provided by another information content provider." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th

---

[4] Moreover, although Plaintiff does not discuss any of these documents explicitly in his complaint, his contract-based claims and his due process claims are based in part on Defendant's Terms of Service/Use and Advertising Standards; thus, because he does not dispute the authenticity of these documents, the documents are also properly incorporated by reference. *See, e.g.*, *Al-Ahmed*, 603 F. Supp. 3d at 867–68 (incorporating by reference documents hinted at in the complaint that were key to the claims and whose authenticity was undisputed).

Cir. 2009), *as amended* (Sep. 28, 2009)) (alterations in original); *accord Vargas v. Facebook, Inc.*, No. 21-16499, 2023 WL 6784359, at *2 (9th Cir. Oct. 13, 2023) (unpublished).

The law thus seeks to limit liability for acts undertaken by interactive computer services pursuant to their role as publishers; a publisher "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it," and therefore traditional publishing conduct protected by section 230 includes "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102. Moreover, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008). In deciding whether Section 230 immunity applies, the Ninth Circuit has not drawn a bright-line distinction between certain causes of action, nor mechanically asked whether the underlying facts concern third-party content. Instead, it has directed courts to "engage in a careful inquiry" to determine whether the "fundamental duty" invoked by the plaintiff "derives from the defendant's status or conduct as a 'publisher or speaker.'" *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1178 (9th Cir. 2024) (quoting *Barnes*, 570 F.3d at 1102), *cert. denied Est. of Bride v. Yolo Techs., Inc.*, 145 S. Ct. 1435 (2025). Thus, even where the conduct or claim at issue might involve publishing activities, section 230(c)(1) may not apply when the alleged duty does not arise from the defendant's status as publisher or satisfaction of the duty would not require the defendant to engage in publishing conduct.

It appears that neither party contests that Defendant is an interactive computer service provider, and many other courts have found Defendant to be an interactive computer service provider. *See Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1117 (N.D. Cal. 2020) (collecting cases). It is also not contested that the content at issue—Plaintiff's campaign pages, his personal profiles, and his advertisements—was created by Plaintiff, not Defendant, and thus the content at issue is attributable to a third party creator.[5] The first and third requirements for

[5] Plaintiff argues that "Section 230 protects passive hosts from third-party content liability, but not for their own editorial actions or content creation," and claims that Plaintiff's "editorial decisions" and use of a

section 230(c)(1) limits on liability are thus met, and the court need evaluate only the second element for each claim: whether the causes of action seek to treat Defendant as a publisher or speaker.

Defendant argues that all eight claims seek to hold it liable for its actions as a publisher because they are all based on Defendant's decision to suspend Plaintiff's ads and accounts, which is a publishing decision that is "perforce immune under section 230." *Roommates.Com,* 521 F.3d at 1170–71. However, while many of the claims are premised on Defendant's suspension of Plaintiff's content, there are two other courses of conduct on which some of the claims are premised: Defendant's failure to provide notice and an appeals process, and Defendant's sending of repeat emails after the suspension of Plaintiff's accounts. These actions are not tied to Defendant's status as publisher—providing notice and an appeals process, even when related to publishing decisions, is not an activity necessarily derived from the status of publisher, and sending emails or other notices about a user's content is similarly not a traditional element of publication. *See, e.g.*, *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 795 (N.D. Cal. 2021) ("That Facebook has the editorial discretion to post or remove content has little do to with the implied promise to explain why content was removed."). *Cf. Bogard v. TikTok Inc.*, No. 24-CV-03131-VKD, 2025 WL 3637035, at *9 (N.D. Cal. Dec. 15, 2025) (finding that affirmative statements by Defendants regarding how they "actually handle reported content" were actionable under section

recommendation algorithm are Defendant's own actions and are not related to third-party content. (Pl.'s Resp. 11; FAC ¶¶ 37, 40, 43, 46.) This argument misunderstands the distinction between the second and third prongs of the section 230(c)(1) analysis: the second element asks whether the claim is based on the platform's status or conduct as publisher, while the third prong asks whether the platform itself contributed to the content at issue. Defendant's "editorial decisions" includes publishing decisions, like whether to remove published material, which are covered by section 230(c)(1) when the content was created by a third-party, but such editorial decisions alone do not constitute content creation. Plaintiff does not allege that any content was made or contributed to by Defendant, except insofar as he alleges that Defendant created the algorithm that "drives" the enforcement of Defendant's content moderation and that this constitutes Defendant's own content. (*E.g.*, FAC ¶ 45.) However, Defendant's use of an algorithm to assist in its publishing functions does not take those actions outside the scope of its conduct as publisher so long as the algorithm is not assisting in the creation of content, which Plaintiff does not allege is the case here. *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (holding that the defendant's use of "features and functions, including algorithms, to analyze user posts" and make recommendations did not defeat section 230(c)(1)). Whether Defendant used the algorithm to perform traditional publishing duties is distinct from whether the algorithm constitutes third-party content, which it does not based on the facts alleged here.

230(c)(1) in claim for fraudulent and negligent misrepresentation because they were separate from general publisher discretion). Claim Two for violation of Plaintiff's Fifth Amendment rights is entirely based on the notice and appeals process; Claim Eight for intentional infliction of emotional distress and Claim Six for breach of the implied covenant of good faith and fair dealing are partially based on this process and on the sending of emails separate from the actual suspension of his accounts and ads. These claims and partial claims do not arise out of Defendant's status as publisher and are not barred by section 230(c)(1).

The remaining claims are based on Defendant's decision to suspend Plaintiff's account pages and advertisements. The Ninth Circuit has consistently held that decisions to publish content, or not publish content, or revoke content from publication, are quintessential publishing functions for which interactive computer services cannot be held liable under section 230(c)(1). *Roommates*, 521 F.3d at 1170–71. However, this does not end the inquiry, as the duties underpinning each cause of action may not arise from Defendant's status as publisher or require it to undertake certain publishing decisions. The source of the duties alleged is different across Plaintiff's constitutional, federal statutory, and contract-based causes of action, and thus a more particularized analysis is warranted.

Plaintiff's Claim One is a constitutional cause of action alleging that Defendant violated his First Amendment rights; his Claims Three and Four are related federal statutory claims for conspiracy to violate his civil rights and failure to prevent the conspiracy. These claims are based squarely on Defendant's decision to remove and suspend Plaintiff's content. The First Amendment claim is based solely on Defendant's publishing conduct inherent to its status as publisher and remedy would require it to undertake further publishing activity by reactivating or reposting Plaintiff's content. The conspiracy claim is essentially an allegation that Defendant coordinated with other entities to make its publishing decisions, and the tools Defendant chooses to use when making publication decisions—including potential consultation with other actors—are part of Defendant's discretion as publisher whether to publish content. Remedy for this claim would also require Defendant to undertake specific publication actions because the alleged outcome and goal of the conspiracy is the removal of Plaintiff's content. It then follows that the failure to prevent

United States District Court
Northern District of California

12

United States District Court
Northern District of California

conspiracy claim is merely an allegation that Defendant failed to prevent a particular editorial decision from being made and enacted, whose remedy would also require Defendant to undertake specific publishing actions. *See Castronuova v. Meta Platforms, Inc.*, No. 4:24-CV-02523-YGR, 2025 WL 1914860, at *4 (N.D. Cal. June 10, 2025) ("Plaintiff's allegation that these decisions [to remove or exclude her accounts] resulted from a larger conspiracy with the federal government does not change the nature of the underlying conduct as protected publisher activity."). It is immaterial that these claims are premised on the removal of Plaintiff's content for political reasons—Ninth Circuit courts have consistently held that Section 230(c)(1) immunizes the removal of political content. *See, e.g.*, *Fed. Agency of News*, 432 F. Supp. at 1120 ("Numerous courts have held that Section 230 immunizes a website's removal of political speech."); *Loomer v. Zuckerberg*, No. 22-CV-02646-LB, 2023 WL 6464133, at *13 (N.D. Cal. Sept. 30, 2023) (holding that plaintiff's claim was barred by section 230(c)(1) where her "theory generally [was] that the alleged enterprise unlawfully bans conservatives from social-media platforms" and her alleged injury was the banning of her account under this scheme). As such, Claims One, Three, and Four are inseparable from Defendant's status or conduct as publisher and are barred by section 230(c)(1). *See Castronuova v. Meta Platforms, Inc.*, No. 4:24-CV-02523-YGR, 2025 WL 1914860, at *3–4 (N.D. Cal. June 10, 2025) (dismissing First Amendment claim against Meta Platforms under section 230 and finding that other Ninth Circuit courts had also dismissed constitutional claims pursuant to section 230, citing to *Brittain v. Twitter, Inc.*, 2019 WL 2423375,*3 (N.D. Cal. June 10, 2019), *Lewis v. Google LLC*, 461 F.Supp.3d 938, 955 (N.D. Cal. 2020), *aff'd*, 851 F. App'x 723 (9th Cir. 2021), and *Ebeid v. Facebook, Inc.*, No. 18-CV-07030-PJH, 2019 WL 2059662, at *5 (N.D. Cal. May 9, 2019)).

Plaintiff's Claim Seven is brought under 42 U.S.C. § 1981, alleging that Defendant discriminated against him in the making and enforcement of contracts "by suspending his ads and accounts based on his conservative political viewpoint." (FAC ¶ 48.) As with the above claims, this claim is based solely on Defendant's suspension and removal of Plaintiff's content and profiles, which is essential publishing activity routinely protected by Section 230(c)(1)'s liability limitations despite the allegations that the removal and deletion of his content were motivated by

13

United States District Court
Northern District of California

political reasons. Accordingly, this claim is also barred by Section 230(c)(1).

Plaintiff brings two contract claims against Defendant: one for breach of contract, and one for breach of the implied covenant of good faith and fair dealing. Plaintiff's Claim Five for breach of contract alleges that Defendant entered into an implied contract with Plaintiff by accepting his payment of $653.00 in exchange for approving his advertisements to run for a ten-day period, and that Defendant breached that contract by suspending the advertisements after only one partial day. (FAC ¶ 42.) The Ninth Circuit has found that section 230(c)(1) does not bar claims which seek to hold an internet provider liable as "the counter-party to a contract, as a promisor who has breached," rather than as a publisher, even when the promise or contract involves performance of a traditional publishing action. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009). This rule was recently applied to a claim alleging that Meta promised to "take appropriate action" against scam advertisements—the Ninth Circuit found that this promise bound Meta with a contractual duty separate from its status as a publisher, and thus held that section 230 did not bar the claim because "Meta's duty arising from its promise to moderate third-party advertisements is unrelated to Meta's publisher status." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 743 (9th Cir. 2024).

However, the Ninth Circuit has also stated that there is no "categorical rule that contract-based claims are never barred by Section 230(c)(1)." *King v. Facebook, Inc.*, No. 22-15602, 2023 WL 5318464, at *2 (9th Cir. Aug. 18, 2023) (unpublished). In affirming the district court, the memorandum opinion in *King* found that "[t]he specific promise to take down explicit content at issue in *Barnes* does not compare to the general promise made by Facebook, and incorporated into its [Terms of Service], to use 'good faith' or make an 'honest' determination before deciding to exercise publishing or editorial discretion." *Id.* District courts have used similar logic to distinguish between promises and enforceable contracts to perform some specific action, and broad statements or terms like those found in terms of service that merely restate a platform's discretion as publisher rather than creating a new, enforceable contractual duty. *See Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 884–85 (N.D. Cal. 2022) (holding that section 230 barred all of the suspension-based claims but that the breach of contract claim was not barred by section

14

230(c)(1) insofar as it was based on the promise in Facebook's Terms of Service to provide adequate explanation for any suspensions, which was not publishing conduct); *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 795 (N.D. Cal. 2021) (barring part of the contract claim because "all that Facebook did here was to incorporate into the contract (the Terms of Service) its right to act as a publisher," which did not defeat section 230, but allowing the part of the contract claim based on Facebook's implied promise to explain its decisions).

Plaintiff's breach of contract claim does not allege that Defendant or any of Defendant's agents made specific, enforceable promises to him related to the suspension of his content; instead, he relies on the general contractual underpinnings of his use of Defendant's platforms and payment to Defendant. His statement that Defendant's acceptance of his payment created a duty to publish his content does not constitute an allegation that Defendant made a specific promise to publish Plaintiff's content which was intended to supersede its discretion as publisher to make publication decisions. Whether based on an implied contract or a document like the Terms of Service, this type of general contract-based allegation has routinely been found insufficient to overcome section 230's bar on liability for publishing conduct. *See, e.g.*, *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1200–01 (N.D. Cal. 2009) (holding that without separate promise to enforce provisions in contracts like terms and conditions, such provisions are not enforceable promises and may be subject to section 230(c)(1) immunity); *Shared.com v. Meta Platforms, Inc.*, No. 22-CV-02366-RS, 2022 WL 4372349, at *3 (N.D. Cal. Sept. 21, 2022) ("To the extent Facebook's Terms of Service outline a set of criteria for suspending accounts . . ., this simply restates Meta's ability to exercise editorial discretion. Such a restatement does not, thereby, waive Defendant's section 230(c)(1) immunity."); *Newton v. Meta Platforms Inc.*, No. 23-CV-00116-JD, 2023 WL 5749258, at *2 (N.D. Cal. Sept. 6, 2023) (finding that "the general allegation that Facebook did not 'live up to its written Community Standards'" when declining to publish the plaintiffs' content did not allege a specific promise enforceable under *Barnes*); *King*, 572 F. Supp. 3d at 795 (holding that section 230(c)(1) immunity applied for contract claim based on the removal of plaintiff's content because "[u]nlike the very specific one-time promise made in *Barnes*, the promise relied upon here is indistinguishable from 'paradigmatic editorial decisions

United States District Court
Northern District of California

United States District Court
Northern District of California

not to publish particular content.'" (quoting *Murphy v. Twitter, Inc.*, 274 Cal. Rptr. 3d 360, 373 (Cal. Ct. App. 2021)); *Rangel v. Dorsey*, No. 21-CV-08062-CRB, 2022 WL 2820107, at \*3 (N.D. Cal. July 19, 2022) (finding that plaintiff's contract claim failed because it was based on the terms of service, which only incorporated Twitter's rights as publisher); *Lloyd v. Facebook, Inc.*, No. 21-CV-10075-EMC, 2022 WL 4913347, at \*9 (N.D. Cal. Oct. 3, 2022) (finding that Facebook's Community Standards constituted a general monitoring policy that did not fall under the *Barnes* framework for avoiding section 230 immunity); *Frenken v. Hunter*, No. 17-CV-02667-HSG, 2018 WL 1964893 (N.D. Cal. Apr. 26, 2018) (finding that Twitter's rules did not create a contract or quasi-contract enforceable under section 230 as to its decision to maintain accounts and transmit messages).[6] As written, Plaintiff's breach of contract claim is premised solely on Defendant's

---

[6] Other courts have gone even further when barring contract claims under section 230(c)(1) to broadly find that contract claims based on the removal of content are inseparable from internet platforms' status as publishers and are therefore barred. *See Yuksel v. Twitter, Inc.*, No. 22-CV-05415-TSH, 2022 WL 16748612, at \*5 (N.D. Cal. Nov. 7, 2022) ("[C]ourts routinely hold that Section 230 immunizes platforms from contract claims, where, as here, they seek to impose liability for protected publishing activity [in this case, the suspension of his account]"); *Kifle v. YouTube LLC*, No. 21-CV-01752-CRB, 2021 WL 10331555, at \*3–4 (N.D. Cal. Oct. 5, 2021) (finding the contract claim to be precluded by 230(c)(1) because it sought "to hold YouTube liable for removing content," which is a quintessential publishing function); *Morton v. Twitter, Inc.*, No. CV 20-10434-GW-JEMX, 2021 WL 1181753, at \*5 (C.D. Cal. Feb. 19, 2021) ("a breach of contract claim premised solely on Twitter's failure to suspend those accounts would be barred by Section 230 . . . because the actions that Morton alleges Twitter failed to take – thereby breaching its duty – are suspending a user's account."); *Zhang v. Twitter Inc.*, No. 23-CV-00980-JSC, 2023 WL 5493823, at \*4 (N.D. Cal. Aug. 23, 2023) ("Courts routinely hold Section 230 immunizes platforms from contract claims, where, as here, they seek to impose liability for protected publishing activity" [in this case, "the suspension of his account and the alleged failure to suspend the third-party user's account"]); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1120 (N.D. Cal. 2020) ("Thus, because Plaintiffs' [contract claims] are predicated on Facebook's decision to remove content, Ninth Circuit law under *Barnes* unambiguously establishes that Plaintiffs' claims treat Facebook as a publisher."). In contrast, still other courts have found that contract claims based on an alleged contractual duty of any kind are not barred by section 230(c)(1). *See Enhanced Athlete Inc. v. Google LLC*, 479 F.Supp.3d 824, 830 (N.D. Cal. 2020) ("[T]he Court finds that Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing is based in contract, and thus is not precluded by Section 230(c)(1)."); *Berenson v. Twitter, Inc.*, No. C 21-09818 WHA, 2022 WL 1289049, \*2 (N.D. Cal. Apr. 29, 2022) ("With regard to breach of contract and promissory estoppel, this order reads our court of appeals' *Barnes* decision to allow those claims to go forward despite Section 230, so long as they are properly pleaded under state law."); *Daniels v. Alphabet Inc.*, No. 20-CV-04687-VKD, 2021 WL 1222166, at \*12 (N.D. Cal. Mar. 31, 2021) ("[D]efendants acknowledged that Section 230(c)(1) immunity would not apply to a properly pled breach of contract claim"). However, reading *Barnes* together with *Calise* and *Estate of Bride*, this court in persuaded that the relevant question is whether there is an "outwardly manifested intention" to create an "enforceable promise" by the internet platform. *Calise*, 103 F.4th at 743. Accordingly, a contract-based claim would not be blocked by section 230(c)(1) if it alleged a specific promise or contract term intended to be enforceable, even if it was based on a quintessential publishing activity like removing or failing to remove content. *E.g.*, *Berenson*, 2022 WL 1289049, at \*2 (finding that defendant's "specific and direct" assurances to plaintiff about whether his content violated new policies created actionable promise on which to base contract claims). On the other hand, a contract term

16

decision to suspend his accounts and his advertisements. Plaintiff's claim for breach of contract does not properly allege that Defendant entered into a contract intended to overwrite its discretion as publisher, and this claim is therefore barred by section 230(c)(1).

Similarly, Plaintiff's sixth claim for breach of the implied covenant of good faith and fair dealing is also barred by section 230(c)(1), insofar as this claim seeks to hold Defendant liable for the suspension of Plaintiff's accounts and ads, for Defendant's decision to continue publishing other content while removing Plaintiff's content, and for the frustration of the contract via Defendant's removal of Plaintiff's content. Any implied promise by Defendant to use "good faith" or any general statements in the terms of service/use about its criteria when making editorial decisions like removing content is not the type of specific, directed promise that could take this claim out from the umbrella of section 230(c)(1), even when the claim is premised on the implied covenant of good faith and fair dealing rather than an explicit term. *See King v. Facebook, Inc.*, No. 22-15602, 2023 WL 5318464, at *2 (9th Cir. Aug. 18, 2023) (unpublished) ("The district court also properly concluded that King's breach of the implied covenant of good faith and fair dealing claim relating to her account termination was foreclosed by *Barnes*. . . . The specific promise to take down explicit content at issue in *Barnes* does not compare to the general promise made by Facebook, and incorporated into its TOS, to use 'good faith' or make an 'honest' determination before deciding to exercise publishing or editorial discretion."); *Shared.com v. Meta Platforms, Inc.*, No. 22-CV-02366-RS, 2022 WL 4372349 (N.D. Cal. Sept. 21, 2022) ("To the extent Facebook's Terms of Service outline a set of criteria for suspending accounts (i.e., when accounts have 'clearly, seriously, or repeatedly' breached Facebook's policies), this simply restates Meta's ability to exercise editorial discretion."). There is no indication from the factual

---

related to a publishing activity does not properly form the basis for a contract claim where there is no manifest intent that the term should be enforceable—section 230(c)(1) applies even though the basis for liability is technically the contract rather than the publisher's status. *See King v. Facebook, Inc.*, No. 22-15602, 2023 WL 5318464, at *2 (9th Cir. Aug. 18, 2023) (unpublished) (finding that the "specific promise" in *Barnes* was not similar to the "general promise" in the Facebook Terms of Service in the case at issue). Applying this distinction to the allegations in this case, the court finds that Plaintiff has failed to demonstrate the type of specific, enforceable promise or contract that would go beyond Defendant's role as publisher, as explained above.

17

United States District Court
Northern District of California

allegations that Defendant made a promise or enforceable contract surrounding the publishing of Plaintiff's content that did more that incorporate its editorial discretion—thus, the contract term or goal frustrated by Defendant's alleged breach of the implied covenant is the same restatement of Defendant's editorial discretion, which the court explained above does not eliminate section 230(c)(1) limits on liability. Plaintiff's allegation that Defendant enacted the suspensions "in bad faith" does not thwart section 230(c)(1) immunity. *See Lewis v. Google LLC*, 461 F. Supp. 3d 938, 953–54 (N.D. Cal. 2020) (explaining that section 230(c)(1) prohibits liability for decisions to remove content and that section 230(c)(1) does not have a good faith requirement), *aff'd*, 851 F. App'x 723 (9th Cir. 2021); *Levitt v. Yelp! Inc.*, No. C-10-1321 EMC, 2011 WL 5079526, at *7 (N.D. Cal. Oct. 26, 2011) ("[Section] (c)(1)'s immunity applies regardless of whether the publisher acts in good faith."). Accordingly, Plaintiff's Claim Six is also barred to the extent it is based on Defendant's suspension of Plaintiff's accounts and removal of his content.

Finally, Plaintiff's Claim Eight for intentional infliction of emotional distress is also barred by section 230(c)(1) to the extent that it is based on Defendant's removal of his content from its platforms. Plaintiff cannot hold Defendant liable for preventing him from accessing its platforms to publish content or removing his content, as this would hold them liable for its quintessential publishing decisions regarding what information may be published and contained on their platforms. *See Reaud v. Facebook Inc.*, No. 23-CV-06329-AMO, 2024 WL 4126066, at *5 (N.D. Cal. Sept. 9, 2024) ("[T]o the extent that Reaud's IIED claim is also based on Facebook 'blocking' him from Facebook, such a claim similarly seeks to hold Facebook liable for its decisions as a 'publisher.'"); *Karam v. Meta Platforms, Inc.*, No. 3:25-CV-01397-AMO, 2025 WL 3079048, at *2 (N.D. Cal. Nov. 4, 2025) (finding that section 230 barred claim for intentional infliction of emotional distress because the claim was "related to Meta's alleged editorial decisions to suspend or ban his account and to permit content posted by other Facebook users"). As such, Claim Eight is barred by section 230(c)(1) to the extent that it is based on the loss of Plaintiff's content and Plaintiff's inability to regain access to his content or accounts.

Thus, Plaintiff's Claim One for First Amendment violations, Claim Three for conspiracy under section 1985(3), Claim Four for failure to prevent conspiracy under section 1986, Claim

18

Five for breach of contract, and Claim Seven for discrimination in contracts under section 1981 are blocked in their entirety by section 230(c)(1); Claim Six for breach of the implied covenant of good faith and fair dealing and Claim Eight for harassment and intentional infliction of emotional distress are blocked by section 230(c)(1) to the extent they are based on the suspension and deletion of Plaintiff's content and profiles; and Claim Two for Fifth Amendment violations is not blocked by section 230(c)(1).

### C. Failure to State a Claim

In addition to section 230(c)(1) immunity, Defendant argues that Plaintiff's complaint fails to state a plausible claim for each cause of action, and it may be dismissed independently for this reason.[7] The court analyzes failure to state a claim for each cause of action in the alternative to section 230(c)(1) immunity.

1. Claims One and Two: Violations of Plaintiff's Constitutional Rights

Plaintiff's first two causes of action allege that Defendant violated his right to free speech and his right to due process under the First and Fifth Amendments to the United States Constitution. The basis for the First Amendment claim is that "Defendant's suspension of Plaintiff's advertisements and accounts violated his First Amendment rights to free speech and political expression." (FAC ¶ 28.) Plaintiff's Fifth Amendment due process claim alleges that "Defendant's failure to provide adequate notice or a functional appeal process for the suspension of Plaintiff's advertisements and accounts violates procedural due process under the Fifth Amendment." (FAC ¶ 33.)

Both of Plaintiff's constitutional claims fail because he has not alleged facts showing that Defendant Meta is a state actor for constitutional purposes. The First Amendment only prohibits the governmental abridgment of speech and does not apply to private actors except in those "exceptional cases" where a private party may be considered a state actor for the purposes of an alleged constitutional deprivation. *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 753 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2846 (2025); *O'Handley v. Weber*, 62 F.4th 1145,

---

[7] Because the court finds other grounds for dismissal, the court does not reach Defendant's argument that its own First Amendment rights foreclose Plaintiff's claims.

19

United States District Court
Northern District of California

1156 (9th Cir. 2023). The Fifth Amendment's due process clause also applies exclusively to the federal government, *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008), and it is only extended to private actors in the rare circumstance that there is "a sufficiently close nexus between the (government) and the challenged action of the . . . (private) entity so that the action of the latter may be fairly treated as that of the (government) itself." *Rank v. Nimmo*, 677 F.2d 692, 701 (9th Cir. 1982) (quoting *Warren v. Gov't Nat'l Mortg. Ass'n*, 611 F.2d 1229, 1232 (8th Cir. 1980)) (alterations in original). A private party may be treated as a government actor when it meets both the "state policy" requirement, under which the alleged constitutional violation must result from a right created by the state or a rule of conduct imposed by the state, and the "state actor" requirement, which may be satisfied by showing that "(1) the private actor performs a traditionally public function; (2) the private actor is a 'willful participant in joint activity' with the government; (3) the government compels or encourages the private actor to take a particular action; or (4) there is a 'sufficiently close nexus' between the government and the challenged action." *Children's Health Def.*, 112 F.4th at 754 (internal citations omitted).

Plaintiff has not alleged facts sufficient to show that Defendant acted pursuant to state policy or constituted a state actor such that it may be treated as a governmental entity for the purposes of his constitutional claims. First, with regards to the state policy requirement, Defendant's suspensions of Plaintiff's ads and accounts and deletion of his content were conducted pursuant to Defendant's own content moderation policy and Terms of Service/Advertising Standards, and there are no facts to suggest those actions are traceable to any state-created right or privilege or to a state-imposed rule of conduct. *See Children's Health Def.*, 112 F.4th at 754–55. Plaintiff's claims that Defendant coordinated with "government-aligned entities" to "moderate election-related content" falls far short of the threshold for showing that a private actor enforced a government rule rather than its own rules.[8] *See O'Handley v. Weber*, 62

---

[8] Moreover, Plaintiff does not identify any specific government agencies or officials in his complaint apart from the Elections Infrastructure Information Sharing and Analysis Center ("EI-ISAC"), which he only describes as a "government-aligned" entity. (FAC ¶ 17.) It is not clear from the FAC whether EI-ISAC is itself a government agency, or if it is an explicit partnership with a government agency, or if it is an entirely separate body that sometimes coordinates with the government, nor is it clear which agency, departments, or officials are involved in it. Thus, it is possible that Plaintiff's complaint alleges no government involvement

F.4th 1145, 1156–57 (9th Cir. 2023) (holding that private company's removal of a post marked as election misinformation by the California Office of Elections Cybersecurity did not establish that the company removed the post pursuant to a state-imposed rule); *accord Children's Health Def.*, 112 F.4th at 754–55 (finding that general alignment of government goals with goals or actions of private actor does not establish that a government rule or right was the cause of those actions). There are no other factual allegations that go beyond these accusations of coordination and partnership, and there is nothing to suggest that anything more than the broad alignment of goals occurred. As such, Plaintiff has not met the state policy requirement.

Second, Plaintiff has not alleged any facts sufficient to show that Defendant was a state actor. Plaintiff primarily invokes the public function test, arguing that Defendant's social media platforms constitute "public forums" or "modern public squares" such that it performs a traditional public function. (Pl.'s Resp. 11–12, Dkt. 52.) However, "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019); *accord Howard v. Am. Online, Inc.*, 208 F.3d 741, 754 (9th Cir. 2000) (finding that an internet information service was not a "quasi-public utility" rendered a state actor for constitutional purposes). The Ninth Circuit has recently held that online social media companies are not transformed into state actors because of their broad hosting of speech. *Prager Univ. v. Google LLC*, 951 F.3d 991, 996–99 (9th Cir. 2020) (rejecting the argument that YouTube performs a public function and is therefore a state actor because (1) hosting speech on a private platform is not an activity traditionally performed by the government, (2) the ubiquity of online social media does not change the analysis, (3) YouTube did not perform "necessary municipal functions," (4) YouTube is not a public forum, and (5) a private entity does not because a public forum by opening its property for public discourse). The reasoning in *Prager University* applies here—Defendant's operation of Facebook and Instagram does not render it a state actor under the public function test. *See Zimmerman v. Facebook, Inc.*, No. 19-CV-04591-VC, 2020 WL

in the conduct at all. However, reading Plaintiff's complaint with as much leniency as possible, the court presumes that this vagueness may be easily corrected and that the government is at least a part of EI-ISAC.

21

5877863, at *2 (N.D. Cal. Oct. 2, 2020) (applying the reasoning of *Prager University* to find that Facebook is not rendered a state actor by virtue of providing a "digital town square").

In addition, Plaintiff's allegations are insufficient to meet the joint action, state compulsion, and nexus tests. Plaintiffs alleging joint action must show that there has been a specific agreement between the private actor and the government such that their actions are "inextricably intertwined." *Children's Health Def.*, 112 F.4th at 755–56. Plaintiff's allegation that Defendant partnered or coordinated with government-aligned entities that "disproportionately flag conservative content" to "moderate election content," (FAC ¶¶ 17, 29), falls far short of the specificity necessary to establish "an agreement or a conspiracy to violate [the plaintiff's] rights in particular." *Id.* at 756 (quoting *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1212 (9th Cir. 2002)). The FAC does not indicate that there was any express agreement to take particular actions with regard to Plaintiff or anyone else. *Id.* ("Without plausible allegations of an agreement to take specific action, we cannot say that Meta's conduct is fairly attributable to the government."). Plaintiff has also not met the state compulsion test because he did not properly allege that the government threatened adverse action or otherwise imposed incentives that essentially compelled Defendant to comply with its requests. *Children's Health Def.*, 112 F.4th at 759. The FAC alleges only that Defendant partnered with government-aligned entities and that Defendant's actions were "supported by coordinated efforts," none of which shows coercion by the government. Finally, Plaintiff did not allege sufficient facts to satisfy the nexus test, which asks "whether 'there is such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself.'" *Kirtley v. Rainey*, 326 F.3d 1088, 1095 (9th Cir. 2003) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). Plaintiff's allegations are inadequate to meet the high burden of showing that Defendant's actions "are fairly attributable to the state." *Kirtley*, 326 F.3d at 1095 (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 836 (9th Cir. 1999)).

Overall, Plaintiff has failed to "allege facts supporting an inference that the government 'is *responsible* for the specific conduct of which [he] complains.'" *Children's Health Def.*, 112 F.4th at 754 (quoting *Ohno v. Yasuma*, 723 F.3d 984, 994 (9th Cir. 2013)). *See also Rogalinski v.*

22

*Meta Platforms, Inc.*, No. 22-16327, 2023 WL 7876519 (9th Cir. Nov. 16, 2023) (unpublished) (affirming the district court finding that Meta Platforms was not a state actor based on allegations that it coordinated with the government to target online misinformation); *Hart v. Facebook, Inc.*, No. 23-15858, 2024 WL 1693355 (9th Cir. Apr. 19, 2024) (unpublished) (affirming the district court holding that Facebook was not a state actor when the allegations only demonstrated "consulting and information sharing" with the government on issues of content moderation); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1121–27 (N.D. Cal. 2020) (finding that Meta was not a state actor under the First Amendment and collecting cases holding the same).

Plaintiff cannot cure his First Amendment claim because it is separately barred by section 230. Moreover, there is no indication that he can successfully amend his Fifth Amendment claim with facts that would cure the significant deficiencies with regard to state action because the entirety of his allegations involving the government pertain to the suppression of his content rather than the deficiencies in Defendant's review and appeal process. As such, his First and Fifth Amendment claims are DISMISSED without leave to amend.

2.  Claim Three: Conspiracy under 42 U.S.C. § 1985(3)

Plaintiff's Claim Three is for conspiracy to deprive him of his civil rights under 42 U.S.C. § 1985(3). While Plaintiff's claim is unclear, it appears that he brings this cause of action pursuant to the first clause of section 1985(3), which covers conspiracy to deprive "any person or class of persons of the equal protection of the laws."[9] To be successful under this clause of section

---

[9] Plaintiff says in his FAC that Defendant conspired to deprive him of "equal protection under the law," (FAC ¶ 36), and he writes in his Response that Defendant conspired "to deprive equal protection," (Pl.'s Resp. 12, Dkt. 53), which invokes the language of the first clause of section 1985(3). However, he later mentions voting rights and election interference and cites to cases involving the third clause of section 1985(3), which proscribes conspiracies to interfere with the right to support or advocate for candidates in federal elections. 42 U.S.C. § 1985(3). This third clause, called the Support or Advocacy Clause, has different elements and requirements than claims brought under the equal protection clause of section 1985(3). Under the first subsection of the Support or Advocacy Clause, a plaintiff must show "(1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections." *Kennedy v. Meta Platforms, Inc.*, No. 3:24-CV-02869-WHO, 2024 WL 4031486, at *13 (N.D. Cal. Sep. 3, 2024) (quoting *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486–87 (S.D.N.Y. 2020)). Under the second subsection, a plaintiff must show (1) a conspiracy that (2) injured someone for advocating for a candidate for federal office. *See Kennedy*, 2024 WL 4031486 at *13. While Plaintiff seems to primarily rely on the Equal Protection clause, the court briefly addresses his FAC under the Support or Advocacy Clause factors for the sake of completeness. Plaintiff fails to state a claim under this clause for at least three separate reasons: first, he has not alleged facts

23

United States District Court
Northern District of California

1985(3), plaintiffs must prove the following elements: "(1) the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy[;] and (3) a resulting injury." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1141 (9th Cir. 2000). Although section 1985(3) has been interpreted to reach private conspiracies to violate constitutionally protected rights, conspiracy claims based on alleged violations of First Amendment rights must show either that the state was directly involved in the conspiracy or that the conspiracy intended to influence the activity of the state.[10] *United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*, 463 U.S. 825, 830–31 (1983).

Plaintiff's section 1985(3) claim fails for multiple independent reasons. First, he has failed to state a claim for an underlying constitutional violation, which is essential to a section 1985(3) claim. *See, e.g.*, *Kay v. Placer Cnty.*, 219 F. App'x 679, 682 (9th Cir. 2007); *Peloza*, 37 F.3d at 524 ("[Plaintiff's] allegations are insufficient to support a claim based on a violation of his constitutional rights of free speech and due process. Accordingly, his allegations of a conspiracy to violate these constitutional rights do not state a claim."). Moreover, Plaintiff has failed to show that he is part of a protected class under the first clause of section 1985(3). The Supreme Court has interpreted the "equal protection" language of section 1985(3) to mean "that there must be some

demonstrating a conspiracy of any kind, as the court explains in the main text; second, he has not alleged any facts to show that any individual voter was forced, intimidated, or threatened because of their voting or their lawful activity supporting or advocating for a candidate; and third, Plaintiff was a candidate for state office in a state election, rather than a federal election, so advocacy related to his campaign is not covered by the second subsection. *See Kennedy*, 2024 WL 4031486 at *10–14 (analyzing section 1985(3) in case brought over Meta's content moderation effecting a presidential campaign account); *Gaetz v. City of Riverside*, 722 F. Supp. 3d 1054, 1072–74 (C.D. Cal. 2024) ("Here, Plaintiffs fail to allege that *any* specific voter was intimidated from providing their support or advocacy to Plaintiffs' reelection campaigns, nor did they allege facts that show how a reasonable voter could be intimidated.").

[10] It appears that the alleged First Amendment violations are the primary object of the claimed conspiracy, but it is not clear whether Plaintiff intended for the alleged conspiracy to cover other conduct like the claimed due process violations. Caselaw in the Ninth Circuit is mixed on the viability of section 1985(3) conspiracy claims based on Fifth Amendment deprivations, *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 524 n.8 (9th Cir. 1994), but even if Plaintiff intended to include the Fifth Amendment violations and that would be a permissible basis for conspiracy claims, he would still be required to show direct government involvement in the conspiracy because the Fifth Amendment also applies only to government conduct. *Scott*, 463 U.S. at 833 ("Because that Amendment restrains only official conduct, to make out their § 1985(3) case, it was necessary for respondents to prove that the state was somehow involved in or affected by the conspiracy.").

racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). In elaborating on the bounds of "otherwise class-based" animus proscribed by this section, the Supreme Court has held that bias on account of economic views or status is not covered, and has opined that it is a "close question" whether the section may "be construed to reach conspiracies aimed at any class or organization on account of its political views or activities." *Scott*, 463 U.S. at 837. The Ninth Circuit has further narrowed this analysis to require that plaintiffs bringing section 1985(3) conspiracy claims allege that they are members of a class that "the courts have designated . . . a suspect or quasi-suspect classification requiring more exacting scrutiny or that Congress has indicated through legislation . . . require[s] special protection." *Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir. 1985); *accord Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536–37 (9th Cir. 1992) (quoting *Schultz* for the general rule that classes under section 1985(3) must show that there is a governmental determination that class members require special assistance in protecting their civil rights).

Defendant alleges in his complaint that he was targeted for being a "conservative," (FAC ¶ 36), that he was targeted for "promoting conservative principles," (FAC ¶ 28), that the conspiracy was "part of a broader effort to suppress conservative voices," (FAC ¶ 39), and that Defendant "target[ed] conservative content," (FAC ¶ 45). He makes no mention of any other class besides "political conservatives" or "people who express politically conservative viewpoints," nor does he allege that he was targeted for being a member of the Republican party. He does not identify any determination by the courts or by Congress that such a class requires special protection, and Plaintiff makes no argument that he is part of a class with governmentally-determined protection, only repeating his conclusory allegations that Defendant conspired to "deprive equal protection" and that "bias evidence" supports this conclusion. (Pl.'s Resp. 12, Dkt. 52.) This is insufficient to meet the class-based animus requirement of a section 1985(3) claim for conspiracy to deprive Plaintiff of equal protection.[11]

---

[11] There is disagreement between the circuits as to whether political groups can constitute protected classes under section 1985(3), and the Ninth Circuit has yet to address this question. *Pasadena Republican Club v.*

Finally, Plaintiff has failed to allege a conspiracy because he has not alleged facts to support his allegation, and "[a] mere allegation of conspiracy without factual specificity is insufficient." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988). The FAC says the following about the alleged conspiracy: "Defendant's actions were facilitated by partnerships with government-aligned entities, such as the Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC), and third-party fact-checking organizations like PolitiFact, which disproportionately flag conservative content, implicating state action." (FAC ¶ 17.) Defendant's conspiracy with "third-party fact-checkers and government-aligned entities" allegedly involved "regular coordination with federal and state officials to moderate election-related content," and Plaintiff's evidence for this conspiracy includes "Defendant's selective enforcement, inconsistent fact-checker emails, and Zuckerberg's admission of bias, supported by coordinated efforts with fact-checkers and EI-ISAC." (FAC ¶¶ 29, 36.) These allegations do not constitute the type of specific factual allegations required to plausibly allege a conspiracy—no timeline is established, no persons involved are identified except Mr. Zuckerberg, no objective is identified or defined beyond "flag[ging]" conservative content and moderating election-related content, and no "meeting of the minds" or "agreement" is described with any level of detail beyond cursory legal conclusions.[12] *See Steshenko v. Albee*, 70 F. Supp. 3d 1002, 1015–16 (N.D.

*W. Just. Ctr.*, 424 F. Supp. 3d 861, 878 (C.D. Cal. 2019), *aff'd,* 985 F.3d 1161 (9th Cir. 2021) ("It does not appear that the Ninth Circuit has addressed whether § 1985(3) reaches conspiracies motivated by political or religious animus"). *Compare Cameron v. Brock*, 473 F.2d 608, 610 (6th Cir. 1973) (politically motivated animus covered), *with Farber v. City of Paterson*, 440 F.3d 131, 138–40 (3d Cir. 2006) (political animus not covered). District courts in the Ninth Circuit have reached different conclusions on this question. *Compare Dodge v. Evergreen Sch. Dist. No. 114*, No. 3:20-CV-05224-RBL, 2020 WL 4366054, at *4–5 (W.D. Wash. July 30, 2020) (political affiliation not a covered group), *with Stevens v. Rifkin*, 608 F. Supp. 710, 722–26 (N.D. Cal. 1984) (animus based on political association is covered). Because Plaintiff has failed to allege constitutional violations, and given that the recent trend has been against the extension of section 1985(3) to a greater number of possible classes, that Plaintiff fails to make an argument as to why his vague class of "conservatives" qualifies for protection under the statute, and that there is no clear Ninth Circuit authority on the matter, this court does not find a reason to extend section 1985(3) to cover animus based on "political viewpoint." *See Dodge*, 2020 WL 4366054, at *5.

[12] Moreover, these allegations fail to allege the conspiracy's "intent" to deprive equal protection based on "invidiously discriminatory animus." *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274–75 (1993) (reiterating that the conspiracy must be "for the purpose" of denying equal protection "because of" the adverse effects of such denial on an identifiable group). Plaintiff alleges only that Defendant partnered with other entities to moderate election content online, and that this moderation was selectively enforced and these partnering groups "disproportionately flag" conservative content—this does not demonstrate that the

26

Cal. 2014) (finding that sufficient conspiracy allegations in the Ninth Circuit should include the alleged specific agreement between the conspirators, the scope of the conspiracy, the role of the defendants in the conspiracy, how the conspiracy operated, when the conspiracy operated, and how the acts taken against the plaintiff furthered the conspiracy).

While it may be possible for Plaintiff to allege further facts about the claimed conspiracy, there is no indication from the complaint that Plaintiff intends to allege any other group classification that would qualify under section 1985(3), and he cannot successfully amend his First Amendment constitutional claim. As such, Claim Three is DISMISSED without leave to amend.

3.   Claim Four: Failure to Prevent Conspiracy under 42 U.S.C. § 1986

Plaintiff's fourth claim is brought pursuant to 42 U.S.C. § 1986. Section 1986 "provides a cause of action for damages where a valid claim for relief has been stated under section 1985." *I.H. by & through Hunter v. Oakland Sch. for Arts*, 234 F. Supp. 3d 987, 994 (N.D. Cal. 2017); *accord Karim-Panahi*, 839 F.2d at 626. Because Plaintiff failed to state a valid claim under section 1985(3), he has also failed to state a claim under section 1986; similarly, because he cannot successfully amend his section 1985(3) claim, Claim Four is DISMISSED without leave to amend.

4.   Claim Five: Breach of Contract

Plaintiff's fifth claim for breach of contract alleges that Defendant entered into an implied contract with Plaintiff by accepting his payment of $653.00 in exchange for approving his advertisements to run for a ten-day period, and that Defendant breached that contract by suspending the advertisements after only one partial day. (FAC ¶ 42.) As an initial matter, Plaintiff's claim fails because it is premised on an implied contract that is superseded by the express, written contract between the parties. "[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a

---

conspiracy was a coordinated, purposeful effort to target conservatives because they are conservatives. While Plaintiff alleges that his ads were flagged "as part of a broader effort to suppress conservative voices," the wording is not clear whether Defendant agreed to be part of that effort or whether the third-party groups flagged his ads because of his viewpoints and Defendant did not object. Allegations of conspiracy require greater clarity to properly put defendants on notice of the claims against them.

valid express contract covering the same subject matter." *Be In, Inc. v. Google Inc.*, No. 12–CV– 03373–LHK, 2013 WL 5568706, at *5 (N.D. Cal. Oct. 9, 2013) (quoting *Lance Camper Mfg. Corp. v. Republic Indem. Co.*, 51 Cal. Rptr. 4th 622, 628 (Cal. Ct. App. 1996)). In such circumstances, the express contract controls. Here, although Plaintiff does not discuss the express contracts in his complaint, there is judicially-noticed evidence of express contracts between the parties in the form of Meta's Terms of Service, Instagram's Terms of Use, and Meta's Advertising Standards. Plaintiff's claim that Defendant's acceptance of his payment created an implied contract by which they agreed to run his ads is directly contradicted by the Advertising Standards and terms of service/use, which reserve to Defendant the ability to reject or restrict advertisements "for violation of [its] policies at any time." (Duffy Decl. Ex. C, Dkt. 50-4, at 4.) Plaintiff's alleged implied contract thus covers the same subject matter (Defendant's conditions for running the ads)[13] and requires a different result than the express contract, which is not allowed under California contract law. *See O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1001 (N.D. Cal. 2014) (finding that the plaintiffs' breach of contract claim failed because the judicially-noticed Terms and Conditions were an express contract superseding the alleged implied contract). Accordingly, Plaintiff has failed to state a claim for breach of contract.

However, even if the court liberally interprets Plaintiff's breach of contract claim to be based on the Terms of Service/Use and the Advertising Standards (rather than an implied contract), the claim would still fail because it fails to state a plausible claim.[14] If Plaintiff's contract claim had been properly brought pursuant to the express contract, it would be barred by the terms of that contract, which give Defendant the right to review and remove his content at any time.[15] (*E.g.*, Duffy Decl. Ex. C, Dkt. 50-4, at 20 ("We reserve the right to reject, approve or

---

[13] Plaintiff also states that Defendant's conduct created an implied contract promising fair and transparent enforcement, although he does not describe how this element of the implied contract was violated beyond the suspension of his accounts as part of the breach of contract claim. In any case, this subject matter— Defendant's enforcement of its conditions for hosting content—is also covered by the express contract, and this alleged implied term cannot support a claim for implied contract.

[14] Under California law, a cause of action for breach of contract must allege (1) a contract; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) the resulting damages to the plaintiff. *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

[15] The Meta Terms of Service include the following provisions: "If we determine, in our discretion, that you

28

United States District Court
Northern District of California

remove any ad for any reason, in our sole discretion. . .").) As for the contract allegations tending toward showing a breach based on an implied promise to operate with fairness and transparency, the express contract once again controls, and no specific contract terms have been identified as the basis of the breach. *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) (plaintiffs did not state a claim for breach of contract where they did not identify the relevant specific provisions of the "developer agreement" or show how the contract was breached). Moreover, Plaintiff has not alleged facts that would support finding any of the various policies in Defendant's Terms of Service/Use and Advertising Standards to be enforceable promises under California contract law. *See Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016) ("[W]hile Facebook's Terms of Service 'place restrictions on users' behavior,' they 'do not create

have clearly, seriously, or repeatedly breached our Terms or Policies, including in particular the Community Standards, we may suspend or permanently disable your access to Meta Company Products, and we may permanently disable or delete your account. We may also disable or delete your account if you repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons. . . . Where we take such action we'll let you know and explain any options you have to request a review, unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of our services, systems, or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons." (Duffy Decl. Ex. A, Dkt. 50-2, at 6.) The same language applies to the removal or restriction of user content. (*Id.* at 4.) The Instagram Terms of Use read as follows: "We can remove any content or information you share on the Service if we believe that it violated these Terms of Use, our policies (including our Instagram Community Guidelines), or we are permitted or required to do so by law. We can refuse to provide or stop providing all or part of the Service to you (including terminating or disabling your access to the Meta Products and Meta Company Products) immediately to protect our community or services, or if you create risk or legal exposure for us, violate these Terms of Use or our policies (including our Instagram Community Guidelines), if you repeatedly infringe other people's intellectual property rights, or where we are permitted or required to do so by law. . . . If you believe your account has been terminated in error, . . . consult our Help Center." (Duffy Decl. Ex. B., Dkt. 50-3, at 5.) Finally, Meta's Advertising Standards include the following language: "We use automated and, in some instances, manual review to enforce our policies. Beyond reviewing individual ads, we also monitor and investigate advertiser behavior, and may restrict advertiser accounts that don't follow our Advertising Standards, Community Standards, or other Meta policies and terms. Our review process may not detect all policy violations, and ads remain subject to review and re-review and may be rejected for violating our policies at any time. It is an advertiser's responsibility to understand and comply with our terms and guidelines, in addition to all local laws, regulations and, where applicable, self-regulatory advertising codes. Advertisers whose ads are rejected will typically be provided an opportunity to edit their ads in order to bring them into compliance and can request another review if they believe their ad was incorrectly rejected." (Duffy Decl. Ex. C, Dkt. 50-4, at 3.) It repeats these basic premises later, with additions: "Ads remain subject to review and re-review at all times, and may be rejected or restricted for violation of our policies at any time. . . If you believe the ad, ad account, user account, Page or Business Account was incorrectly rejected or restricted, you can request a review of the decision in Account Quality." (*Id.* at 4–5.) Election-specific ads are also subject to restrictions under the Advertising Standards: "Advertisers can run ads about social issues, elections or politics, provided the advertiser complies with all applicable laws and the authorization process required by Meta. Meta may restrict issue, electoral, or political ads. In addition, certain content related to elections may be prohibited by local law or remove in specific regions ahead of voting." (*Id.* at 14.)

United States District Court
Northern District of California

affirmative obligations.'" (quoting *Young v. Facebook, Inc.*, No. 5:10-CV-03579-JF/PVT, 2010 WL 4269304, at *3 (N.D. Cal. Oct. 25, 2010)); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1200 (N.D. Cal. 2009) ("Under California law, 'if a contract is to be a basis of liability for the defendant's violation of [its own terms and conditions] . . . , it must be a contract in which the defendant promises to abide by [these terms].'" (edited for clarity) (quoting *Souza v. Westlands Water Dist.*, 38 Cal. Rptr. 3d 78, 89 (Cal. Ct. App. 2006)). *Cf. King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 789 (N.D. Cal. 2021) (finding that plaintiff had minimally shown that "it [was] plausible that Facebook is obligated to provide at least some information in addition to the fact that the account has been suspended or terminated").

While the language of the Terms of Service/Use and Advertising Standards do not seem to create the kind of enforceable promise necessary for this claim—for example, by stating that advertisers whose ads are rejected will "typically" have an opportunity to request review—the court cannot say at this juncture that Plaintiff cannot successfully amend this claim to identify the specific provisions that were breached. Additionally, although the breach of contract claim as written is blocked by section 230(c)(1), it is possible for Plaintiff to amend this claim such that section 230(c)(1) would not apply. As such, Plaintiff's claim for breach of contract is DISMISSED with leave to amend to the extent that it is not barred by section 230(c)(1).

5.   Claim Six: Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff's sixth claim states that Defendant violated the implied covenant of good faith and fair dealing "by suspending Plaintiff's ads and accounts in bad faith, without providing specific violations despite appeals, and targeting conservative content while allowing similar ads from other viewpoints." (FAC ¶ 45.) Plaintiff has failed to state a claim for breach of the implied covenant of good faith and fair dealing based on both the suspension and deletion of his content and accounts and based on Defendant's process for notifying him of their publishing decisions and responding to his appeals.

The implied covenant of good faith and fair dealing is tied to an existing specific contractual obligation—it is well established that "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Devs.*

*(Cal.), Inc. v. Marathon Dev. California, Inc.*, 826 P.2d 710, 727 (Cal. 1992); *accord Lewis v. Google LLC*, 461 F. Supp. 3d 938, 961 (N.D. Cal. 2020). In California, claims for breach of this implied covenant must allege the specific contract term that was frustrated by Defendant's conduct. This claim suffers from the same deficiencies as the breach of contract claim—he has not identified the specific contract provisions that were thwarted, and he has not alleged facts to support the finding that those provisions were enforceable contract terms rather than general policies. Moreover, the implied covenant of good faith and fair dealing cannot require a party to go beyond the terms of a contract and cannot contradict the express terms. See *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 885 (N.D. Cal. 2015) ("[I]f defendants were given the right to do what they did by the express provisions of the contract there can be no breach." (quoting *Carma Devs.*, 826 P.2d at 728)). Here, Defendant's Advertising Standards specifically give Defendant the right to reject ads "for any reason, in [its] sole discretion." (Duffy Decl. Ex. C, Dkt. 50-4, at 14.) Thus, Defendant is explicitly allowed under the terms of the contract to reject Plaintiff's ads for any reason whenever it wants.

Finally, Plaintiff's claims that Defendant violated the implied covenant through its non-functional appeals process is also not borne out by the facts as alleged. Plaintiff states that he replied to the emails about the suspension of his ads requesting further information and that the links to the appeals portal were broken, and that despite his entreaties he was never given further explanation as to the rejections of his content. While this is unfortunate, the Advertising Standards explicitly include the means for requesting review of ad rejections—through requesting a review "in Account Quality"—and do not guarantee that requests for review will be granted or that specific violations information will be provided to advertisers. (*Id.* at 5.) "[I]t is well settled the implied covenant does not extend so far as to impose enforceable duties that are beyond the scope of the contract, nor does the covenant prohibit actions that are expressly authorized by the contract's terms." *Jenkins v. JPMorgan Chase Bank, N.A.*, 156 Cal. Rptr. 3d 912, 935 (2013), *as modified* (June 12, 2013), *disapproved of on other grounds by Yvanova v. New Century Mortg. Corp.*, 365 P.3d 845 (Cal. 2016). The express contract here does not require that Plaintiff be given detailed information or an opportunity to appeal if his ads are rejected, and it expressly allows

31

Defendant to reject ads for any reason in its sole discretion. Without more, the factual assertions do not state a claim for breach of the implied covenant of good faith and fair dealing. As with the breach of contract claim, although the court is skeptical that Plaintiff can successfully amend this claim, it cannot be categorically ruled out. As such, Claim Six is DISMISSED with leave to amend.

6.    Claim Seven: Discrimination in Contracts under 42 U.S.C. § 1981

Plaintiff's seventh claim alleges that Defendant violated 42 U.S.C. § 1981 because "Defendant's actions—approving his ads, accepting payment, then suspending them without cause while permitting liberal ads—denied him equal contractual rights, motivated by viewpoint bias." (FAC ¶ 48.) Section 1981 prohibits only racial discrimination in the making and enforcement of private contracts. *E.g.*, *Shah v. Mt. Zion Hosp. & Med. Ctr.*, 642 F.2d 268, 272 (9th Cir. 1981). Plaintiff has not alleged any facts to suggest that Defendant racially discriminated against him or that his race was the reason he was allegedly denied equal contractual rights, and thus he has failed to state a claim under section 1981. Plaintiff's complaint contains no hint that he could amend this claim to allege racial discrimination, and this claim is barred by section 230(c)(1); accordingly, Claim Seven is DISMISSED without leave to amend.

7.    Claim Eight: Harassment and Intentional Infliction of Emotional Distress

Plaintiff's final claim is for harassment and intentional infliction of emotional distress ("IIED") due to "Defendant's ongoing pattern of sending threatening and harassing emails after the permanent suspension of Plaintiff's accounts." [16] (FAC ¶ 50.) He alleges that these emails

---

[16] Because it is not entirely clear whether Plaintiff is stating two causes of action (harassment and IIED) or if he is stating an IIED claim based on harassment, the court notes that there is no common law tort of "harassment" recognized in California. *McCree v. State of Cal. Dep't of Conservation*, No. 12-CV-04127-JST, 2014 WL 1936504, at *6 (N.D. Cal. May 14, 2014) ("California courts do not recognize a common law tort of harassment."). If Plaintiff intended to bring statutory harassment claim pursuant to California Code of Civil Procedure § 527.6, which allows persons who have suffered harassment to seek temporary restraining orders and injunctions against such behavior, he has not made it clear that this was his intent. Moreover, even if this claim cited section 527.6, it would still fail to state a claim—for the same reasons that the IIED claim fails as described below, Defendant's alleged conduct does not amount to civil harassment as statutorily defined, which requires "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys or harasses the person, and that serves no legitimate purpose." Cal. Code Civ. Proc. § 527.6(b)(3). See *Copelin v. Athene Annuity & Life Co.*, No. 2:25-CV-00832-SB-JPR, 2025 WL 2551079, at *3 (C.D. Cal. July 31, 2025) ("Even assuming that this special state procedure [under section 527.6] could be treated as a cause of action cognizable in federal court, Plaintiff

32

caused him "severe emotional distress," which "was compounded by the loss of irreplaceable personal content and the public reputational harm from false allegations of policy and copyright violations." (FAC ¶ 51.)

Despite the fact that section 230(c)(1) does not serve as a total bar to this claim, Plaintiff still fails to state a claim on which relief can be granted. "A cause of action for intentional infliction of emotional distress exists when there is '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" *Reaud v. Facebook Inc.*, No. 23-CV-06329-AMO, 2024 WL 4126066 (N.D. Cal. Sept. 9, 2024) (quoting *Hughes v. Pair*, 209 P.3d 963, 976 (Cal. 2009)). Conduct is outrageous if it is so extreme that it is outside the bounds of what is tolerated in a civilized community. *Zhang v. Twitter Inc.*, No. 23-CV-00980-JSC, 2023 WL 5493823, at *6 (N.D. Cal. Aug. 23, 2023); *Corales v. Bennett*, 567 F.3d 554, 571 (9th Cir. 2009). Moreover, "[a]n IIED claim 'calls for intentional, or at least reckless conduct—conduct intended to inflict injury or engaged in with the realization that injury will result.'" *Reaud*, 2024 WL 4126066, at *3 (quoting *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982)).

Plaintiff has not identified any conduct by Defendant beyond the sending of five emails: two of the emails were identical, informing Plaintiff that his accounts or advertisements had been identified as and restricted for using copyrighted music; four of the messages informed Plaintiff of Defendant's findings upon reviewing the content; and one sent "on behalf of Universal Music Group" included information about the penalties for violations of copyright law and the possibility of a lawsuit. (FAC ¶ 13.) None of this conduct plausibly rises to the level of "outrageous" behavior. There are also no facts alleged to support the contention that Defendant's conduct was intended to injure or committed with the knowledge that sending such emails was likely to cause

has neither alleged harassment as defined by the statute nor sought relief authorized by the statute, as she seeks monetary damages"); *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1155–56 (N.D. Cal. 2013) (dismissing claim brought under 527.6 where "[n]one of the conduct amounts to civil harassment," in part because there was no allegation that conduct lacked legitimate purpose).

United States District Court
Northern District of California

extreme emotional distress, and the allegations regarding Plaintiff's emotional reaction are barebones. These allegations are insufficient to give rise to the inference that Defendant is liable under this tort claim. As such, he has failed to state a plausible claim for IIED on which relief may be granted and Claim Eight is DISMISSED. However, to the extent that this claim is not barred by section 230(c)(1), the court grants Plaintiff leave to amend.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED**. Claims 1, 2, 3, 4, and 7 are **DISMISSED** without leave to amend. Plaintiff is **GRANTED** leave to amend Claims 5, 6, and 8, to the extent that these claims are not barred by Section 230(c)(1) in accordance with this Order. Plaintiff has **thirty (30) days** from the entry of this Order to file any amended complaint. Failure to file an amended complaint will result in the dismissal of this action.

**IT IS SO ORDERED.**

Dated: April 28, 2026

_____
ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California

34